IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SIERRA CLUB et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  1:09-cv-131 CW<br><br>Judge Clark Waddoups |

The United States Forest Service, Chip Sibbernsen, and Harv Forsgren (collectively "the Forest Service") approved the Ogden Ranger District Travel Plan ("Ogden Travel Plan"). Plaintiffs Sierra Club, Wild Utah Project, Western Wildlife Conservancy, and Citizens' Committee to Save Our Canyons have appealed this decision, alleging that it violated the National Environmental Policy Act ("NEPA") on several grounds.  As explained below, the court finds that, although the determination was adequate in most regards, the decision to approve the Travel Plan did not meet the requirements of NEPA in three respects.  First, the Forest Service failed to provide notice of available support for the public to understand the information cataloguing illegal routes.  Second, the Forest Service failed to adequately support its assumptions about the impact of illegal user-created routes.  And third, the Forest Service failed to explain explicitly its evaluation of the cumulative impacts of its decision on the Shoshone Trail System.

## PROCEDURAL BACKGROUND

The Forest Service released a revised Wasatch-Cache National Forest Plan ("the Forest Plan") in March of 2003.  This Travel Plan established several goals, including the management objective of updating the motorized Travel Plan for the Ogden Ranger District, a process which was to include the creation of a "user created route inventory."  OTP06969.[1]

In July 2003, the Forest Service announced a proposal to update the Ogden Travel Plan, OTP01710, and on March 31, 2004, it published an official Notice of intent to prepare an environmental impact statement ("the Notice") in the Federal Register.  OTP01706.  The Notice explained that increasing demand for motorized recreation necessitated the Travel Plan revision, and stated that "unmanaged motorized recreational use has resulted in a labyrinth of unauthorized [off-road vehicle] trails, denuded hillsides, erosion from gullies and ruts, loss of aesthetic appeal, and deterioration of quality wildlife habitat."  OTP01707.  The Notice further stated that "[o]ver the past decade there has been an alarming increase in illegal user created trails."  *Id.*  It concluded, "[t]he objective of this analysis is to take a systematic look at these historic and user created trails and make decisions about which should be incorporated into the system and which should be removed and rehabilitated."  *Id.*

In December 2004, the Forest Service released the Ogden Ranger District Travel Plan Draft Environmental Impact Statement ("DEIS"), which was followed by a period of briefings, meetings, and field trips to gather comments from the public and interested local groups.  During this time all Plaintiffs made several comments about the DEIS, covering all issues raised in this

---

[1] The OTPXXXXX format is used throughout this opinion for all citations to the administrative record.  This record is available in the clerk's office.

case.  Plaintiffs' critique of the DEIS included a proposed alternative for the Forest Service to consider in its environmental analysis.  OTP06570.

Following the comment period, in March 2006, the Forest Service issued the Ogden Ranger District Travel Plan Revision, Record of Decision and Final Environmental Impact Statement ("ROD/FEIS").  Plaintiffs brought an administrative appeal on grounds similar to those raised in the present case.  The Reviewing Officer recommended reversal under NEPA, which led Forest Supervisor, Faye Krueger to reverse the ROD/FEIS on the grounds that its analysis of the cumulative effects of the decision was inadequate.  OTP10789.

In response to Krueger's decision, the Forest Service created a Draft Supplemental Environmental Impact Statement ("DSEIS") which was issued on March 21, 2007.  Again, Plaintiffs submitted timely comments, criticizing the DSEIS on several different grounds. Following the public comment period, the Forest Service issued the Ogden Ranger District Travel Plan Revision Record of Decision and Final Supplemental Environmental Impact Statement ("ROD/FSEIS").  This ROD/FSEIS did not replace the ROD/FEIS entirely, but supplemented and replaced discrete sections of the ROD/FEIS.  OTP11151.

Plaintiffs, once again, appealed the Forest Service's decision, but this time the Appeal Officer recommended approval of the plan.  Supervisor Krueger agreed and approved the ROD/FSEIS.  OTP11480.  After the denial of their appeal, Plaintiffs commenced this action on September 30, 2009, by filing a Petition for Review of Agency Action and Complaint for Injunctive and Declaratory Relief.

## STANDARD OF REVIEW

The Administrative Procedures Act states that a court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The Supreme Court has identified the following four circumstances where an agency decision is arbitrary and capricious:

> [I]f the agency has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

When reviewing the agency's factual determinations, the court must evaluate "whether the agency took a hard look at information relevant to the decision."  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (internal quotations omitted).  This does not mean, however, that the court may "fly speck" the environmental impact statement ("EIS"), as "[t]he NEPA process involves an almost endless series of judgment calls . . . .  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts."  *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  In short, the court is to determine whether the Forest Service made its decision in the right way, not whether the decision itself was ultimately correct.  Furthermore, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."  *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988).

## LAW AND ANALYSIS

In their opening brief, Plaintiffs raise many alleged deficiencies in the Forest Service's ultimate decision.  From these, the court has identified four main issues: 1) whether the Forest Service sufficiently considered the impact of illegal, user-created trails upon the Ogden Travel Plan, 2) whether further analysis on the impact of the Shoshone Trail designation is required, 3) whether the Ogden Travel Plan sufficiently analyzed the effects of dispersed camping, and 4) whether the Forest Service evaluated a sufficient array of alternatives, particularly where it did not incorporate Sierra Club's suggested alternative as an option in the ROD/FEIS and ROD/FSEIS.[2]  All of these deficiencies, Plaintiffs contend, violate NEPA.  The court will examine the merit of each of these arguments in turn.

NEPA is intended to foster 1) informed agency decision-making and 2) informed public participation in the agency decision-making process. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177–78 (10th Cir. 2008).  Under NEPA, an agency's factual determinations must have been made after "the agency took a hard look at information relevant to the decision." *New Mexico ex rel. Richardson*, 564 F.3d at 704 (internal quotations omitted).  The hard look standard requires an agency to present "the environmental impacts of the proposal and alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options," but this process need not necessarily include the development of hard data. *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1179 (quoting 40 C.F.R. § 1502.14).

---

[2]  Plaintiffs also pled, but did not brief, additional claims involving the violation of Executive Orders 11644 and 11989.  The court has already dismissed these claims.  Minute Entry, Dkt. No. 39 (Feb. 25, 2011).

An agency must address cumulative impacts in an EIS.  40 C.F.R. § 1508.25.  A

cumulative impact is "the impact on the environment which results from the incremental impact

of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40

C.F.R. § 1508.7.  Circuit courts agree that "an environmental effect is 'reasonably foreseeable' if

it is 'sufficiently likely to occur that a person of ordinary prudence would take it into account in

reaching a decision.'"  *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549

(8th Cir. 2003) (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)); *see also La.*

*Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 358 (5th Cir. 2006).  In the Tenth Circuit,

"[e]ven as to impacts that are sufficiently likely to occur such that they are reasonably

foreseeable and merit inclusion, the [EIS] need only furnish such information as appears to be

reasonably necessary under the circumstances for evaluation of the project."  *Utahns for Better*

*Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1176 (10th Cir. 2002).  After all, "NEPA does

not prohibit approval of projects with negative cumulative effects; it only requires that the Forest

Service consider and disclose such effects."  *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127,

1140 (10th Cir. 2007).

## I.  USER CREATED TRAILS

In drafting its proposed Travel Plan alternatives, the Forest Service reviewed trails which

were being illegally used, including routes which had been illegally created by users, and

determined whether any of these trails should be designated as legal for motorized use. The

Forest Service further assumed in its analysis that all illegal trails that were not being opened for

motorized use would be closed and rehabilitated under every alternative, including the No

6

Action Alternative.  The Forest Service further assumed that through increased education and enforcement, those closures would be effective, although it recognizes that some illegal use will continue.  *See, e.g.*, OTP07046; OTP11288.  The Forest Service deemed the issue of illegal trail use and creation as "non-significant" because "a more effective enforcement program is needed regardless of which alternative is selected."  OTP02502.  Plaintiffs argue that the issue of illegal trails was not adequately addressed to the extent required by the scope of the ROD/FSEIS and did not fulfil NEPA's hard look requirement.  As described below, the court finds that a limited amount of information required by the scope of the ROD/FSEIS was hard to use in the form disclosed to the public.  Additionally, the Forest Service failed to provide support for some of the assumptions it made which is necessary for it to satisfy the requirement that it take a hard look at the impact its decision might have on the use and creation of illegal motorized routes.

A.      **Scope of the ROD/FEIS and ROD/FSEIS**

Plaintiffs and the Forest Service both agree that the scope of the ROD/FEIS and ROD/FSEIS required the Forest Service to inventory and analyze illegal trails within the area in order to properly manage off-road vehicle use.  The ROD/FEIS establishes a need to "systematically analyze which . . . historic and user created trails should be incorporated into the system . . . and which should be closed and rehabilitated."  OTP06921.  Plaintiffs maintain that the Forest Service failed to do this.  Plaintiffs' Opening Brief at 24, Dkt. No. 26 (May 21, 2010). In contrast, the Forest Service contends that its detailed treatment of illegal routes proposed to be opened and general treatment of illegal routes designated closed satisfied NEPA's hard look criteria.  Defendants' Response to Plaintiffs' Brief for Review of Agency Action ("Forest Service Brief") at 26–27, Dkt. No. 27 (July 9, 2010).

7

From the record, it appears that the Forest Service catalogued miles of illegally used and created trails, OTP10838, dismissed a large portion of them as inappropriate for inclusion in the legal motorized trail system, and then carefully considered the remaining miles by reviewing the relative benefits and environmental impacts of legalization.  The court finds that such an approach sufficiently constitutes a "systematic analysis" as required by the stated scope of the environmental impact statements.

Under NEPA, however, it is not sufficient only to consider relevant information, but that information must also be adequately disclosed to the public.  NEPA's "twin aims" are "informed agency decision making and public access to information."  *Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 707 (10th Cir. 2009).  The catalogue of illegal trails was used by the Forest Service in making its decision.  Nevertheless, the information is coded in a complex spreadsheet consisting of over one hundred oversized pages.  PDF of Excel Spreadsheet, Exhibit 2 to Motion to Supplement the Administrative Record and Memorandum in Support Thereof, Dkt. No. 31 (Oct. 25, 2010) (after the initial electronic filing failed, the spreadsheet was filed conventionally with the court, Notice of Conventional Filing, Dkt. No. 33 (Oct. 28, 2010), and admitted to supplement the administrative record,  Minute Entry, Dkt. No. 39 (Feb. 24, 2011)).

The Plaintiffs argue that the spreadsheet was so difficult to understand that it failed to provide the public with adequate disclosure.  The Forest Service responds that providing the public with a clear map of all illegal trails would potentially increase illegal use and undermine enforcement efforts.  Moreover, the Forest Service argues that the Plaintiffs had the spreadsheet in an electronic format and never complained to the Forest Service that it was unable to use or understand the data.  Public disclosure under NEPA requires that the information be made

available in a reasonable format.  The format in which the information is disclosed should take into account the competing needs of the public for information balanced against the Forest Service's responsibility to protect against illegal use and destruction of the public lands.  In this case, the Forest Service made the information available, but failed to adequately invite inquiry and offer assistance should the interested members of the public fail to understand how to access or translate the relevant information.  Notice to the public that such assistance is available would have addressed this concern, while allowing the Forest Service to assure that the interested public was using the information for a legitimate purpose and not to damage or misuse the public lands.

**B.**   **Illegal Trails Under Each Alternative**

The Forest Service assumed in its evaluation that the potential effect on the illegal use of closed trails and the future development of user-created trails would be the same under each alternative.  It is undisputed that illegal trail use and formation may have negative environmental consequences, including a "substantial effect on wildlife if not held in check."  OTP07108.  The Forest Service recognized that, no matter which action it took, "[n]ew unauthorized routes will be created and previously closed routes will be illegally used."  *Id.*  Nevertheless, the Forest Service concluded it could assume the impact would be the same under each alternative without support for that conclusion and without careful consideration of whether illegal use would increase or decrease.  When pressed on the need to do such an evaluation, the Forest Service responded that "[i]t would be speculation to guess if a new route is more or less likely to create new user created trails" and that "all unauthorized roads or trails will continue to be closed and

rehabilitated."  OTP10899.  As explained below, this response, without more, was insufficient to satisfy NEPA's hard look requirement.

During the review process, the Forest Service received public comments which focused on the potential impact a choice of alternatives might have upon illegal trail use and formation. The Sierra Club reminded the Forest Service that "[t]he more miles of open routes there are in the system, the more difficult it will be to provide adequate law enforcement."  OTP02117. Another comment observed that well-planned, "exceptional" trail systems from other areas featured "little off trail use or unauthorized creation of new trails." OTP02162.  One letter urged the Forest Service to look at each road and trail individually to assess the prevalence of ghost trails, which are the relatively faint trails created when a motorized vehicle veers off an established route.  OTP02226.  Several members of the public indicated concern that the Forest Service's decision to open some user-created trails to legal motorized use would reward bad behavior and, therefore, encourage the proliferation of illegal trail pioneering.  *See, e.g.*, OTP02113; OTP02520.  The Utah Division of Wildlife Resources voiced approval for one trail and disapproval for another based on how easily the surrounding topography would allow drivers to veer off-trail and forge new paths.  OTP06750.

The assumption that the impact on illegal use would be the same under each alternative was also a concern of the federal Environmental Protection Agency ("the EPA").  A representative of the EPA wrote:

> We therefore recommend that particularly for proposed new routes that adjoin relatively undisturbed or sensitive resources, it is important to disclose whether the surrounding landscape and other considerations make it more or less likely that user-developed routes would be cut . . . .  Given the historic lack of success with managing this issue through education and enforcement, and given the growing significant effects from unauthorized use described in the DEIS, we

10

believe this issue should be included among the significant issues driving the analysis.  Designing and evaluating alternatives based on the potential for unauthorized use could result in alternatives that help to reduce this growing problem.

OTP06688.

Despite these concerns, the Forest Service's analysis on the interplay between legal and illegal trails in the ROD/FEIS consisted of an introductory statement that it believed that "the extended miles of trail and the creation of motorized loop trails [under the chosen alternative] will result in ATV riders staying on designated routes which over time will lead to greater success in reclamation of previously disturbed areas."  OTP06943.  The Forest Service failed, however, to provide support for this proposition and failed to discuss any other aspect of the relationship between the alternative chosen and illegal use.

The EPA's comments on the DEIS were omitted from the ROD/FEIS and designated as not being applicable to the project.  In the DSEIS, the Forest Service apologized for this error and responded to the EPA's letter with a statement that "[u]nauthorized trails are acknowledged in the EIS and the effects are incorporated into the analysis" and a protest that further analysis would merely constitute "speculation."  OTP10899.  The EPA wrote a second letter to the Forest Service, stating that it did not find its response adequate and adding that, in its opinion, the ROD/FEIS and DSEIS did not contain sufficient environmental analysis.  OTP11020–11020.  No relevant changes were made, however, between the DSEIS and the ROD/FSEIS.

The test of adequacy of an EIS is to be "pragmatic," requiring "a good faith attempt to identify and to discuss all foreseeable environmental consequences."  *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir. 1997), *cert. denied*, 439 U.S. 1392 (1978).  Speculation is recognized as being "implicit" in NEPA, and judges "must reject any attempt by

agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *N. Plains Res. Council v. Surface Transp. Bd.*, --- F.3d ----, No. 97-70037, 2011 WL 6826409, *7 (9th Cir. Dec. 29, 2011) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003)).  An environmental effect may be "too speculative for inclusion in the EIS if it cannot be described at the time the EIS is drafted with sufficient specificity to make its consideration useful to a reasonable decision maker." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1286 (1st Cir. 1996) (internal quotations omitted).

        The court finds that the Forest Service's responses to the concerns expressed about increased illegal use did not satisfy the requirement for a good faith attempt to consider the varying impacts of illegal trails by alternative.  The Forest Service repeatedly acknowledged that illegal trail use and creation were a significant environmental problem.  The large number of comments the Forest Service received on this issue shows that many individuals and organizations thought the illegal trail problem was an important one to consider in making a final determination, indicating that the cumulative effects of future illegal trails were reasonably foreseeable and must be analyzed under NEPA.  *See Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003).

        The Forest Service attempted to meet this requirement by designating the relationship between its actions and illegal trails as "speculative," but speculation is implicit in, not precluded by, NEPA.  Simply assuming the impact would be the same regardless of which alternative was chosen, without support for that assumption, fails under NEPA.  An assessment of existing trails may have shown that some areas would suffer more from ghost trails, whether some routes may

make it more likely for the public to access illegal trails, whether topography in some areas would make the creation of illegal trails more or less likely, and whether some areas might be more or less sensitive to the environmental impact of illegal motorists.  The Forest Service may have been able to provide support for the assumption that the impact on illegal use was the same regardless of which alternative was selected.  But it failed to explain even the reason it reached this conclusion.  The Forest Service should have at least discussed the issue, stated its conclusion and provided support.  The discussion of how the Forest Service would have addressed these issues would have been valuable in informing the public and aiding the decision maker.

Alternatively, the Forest Service could have shown that its expectations that illegal use would be reduced under all alternatives were not merely wishful thinking.  *See Sierra Club v. U.S. Dep't of Agric.*, No. 96-2244, 1997 WL 295308, at *29 (7th Cir. May 28, 1997) (holding under NEPA that an agency must either explain why new enforcement efforts would minimize illegal use or include the impacts of illegal trail use in its analysis); *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 924 (D. Minn. 2005) (same).  If the Forest Service had shown why, under the hard look standard required by NEPA, it expected its previously ineffective education and enforcement plans to produce better compliance, then it could establish grounds to make the assumption that illegal trail use would vary little by alternative.

While the Forest Service's aspiration to educate users and better enforce trail restrictions is appropriate, support is lacking that this will likely be effective, as even the ROD/FEIS acknowledged.  OTP07108 ("New unauthorized routes will be created and previously closed routes will be illegally used.").  The environmental impact of past, present and future illegal trail creation and use is an important aspect of the problem, which may vary significantly based on

13

the extent and location of existing legal trails.  The ROD/FEIS and ROD/FSEIS fail to provide support for the assumption that the impact would be the same under all alternatives and do not analyze how the impacts may be different.  The lack of analysis and support make any conclusion arbitrary and capricious.

## II.      DESIGNATION OF THE SHOSHONE TRAIL

In 2004, the Forest Service, the State of Utah Division of Parks and Recreation, the Utah Division of Wildlife Resources, the Bureau of Land Management, Cache County, and Rich County entered into a Memorandum of Understanding which established a motorized trail system known as the Shoshone ATV Trail.  OTP11210–11211.  The Shoshone Trail extends over 220 miles of trails, approximately 44 miles of which lie within the Ogden Ranger District along trails designated as open by the Travel Plan.  OTP11212.

Plaintiffs make three separate, but related arguments concerning the Shoshone Trail. First, Plaintiffs contend that the Forest Service should have considered the possible future expansion of the Shoshone Trail system in making its determination.  Second, they argue that the Forest Service did not sufficiently consider the impact the trail-system designation might have on increasing recreational motorized use in the Ogden Ranger District.  Third, they argue that the Forest Service must analyze the impact that new trails in the Ogden Ranger District might have on increasing the use of the Shoshone Trail system as a whole.  As explained below, the first two arguments are not convincing, but the Forest Service is required to analyze the impact new trails in the Ogden Ranger District could have on the Shoshone Trail system.

A.      **Potential Future Expansion**

Plaintiffs argue that the Forest Service must consider the reasonably foreseeable impacts that may be caused by future expansions of the Shoshone Trail.  Plaintiffs' Opening Brief at 33.  When the Forest Service designated the initial 220 mile Shoshone Trail system, it also identified over 300 miles of potential trails.  OP11211.  Some of these potential trails were opened in the Travel Plan, though they were not designated as part of the Shoshone Trail, and are not on the current Shoshone Trail maps.  The Forest Service responds that there was no current, live proposal to expand the Shoshone Trail beyond the 220 miles currently included.  Forest Service Brief at 29.

In the Tenth Circuit, the impacts of a potential future project must be considered in an EIS only when "the actions [are] so interdependent that it would be unwise or irrational to complete one without the others."  *Airport Neighbors Alliance v. United States*, 90 F.3d 426, 430 (10th Cir. 1996) (internal quotations omitted).  Thus, in *Utahns for Better Transportation*, the Tenth Circuit found that in opening up a four lane highway, an agency need not consider a future expansion to a six lane highway, even though a wide median was left to make such an addition possible in the future.  *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1173 (10th Cir. 2002).  This is because the court determined that it was not unwise or irrational for the agency to build a four lane highway and not later expand it.  *Id.*  Here, the court finds that it is not unwise or irrational to revise the Ogden Travel Plan in accordance with the Forest Service's determination, even if the Shoshone Trail is never expanded beyond its current 220 mile scope.  Therefore, no cumulative impacts analysis is required for potential additions to the Shoshone Trail that are not the subject of a current proposal.

**B.**      **Trail Designation**

The Forest Service named the Shoshone Trail as part of the 2003 Forest Plan, but deferred a detailed NEPA analysis until a site-specific action was undertaken.  Plaintiffs argue that the Forest Service has taken site-specific actions in developing the Shoshone Trail by creating a trail management plan, distributing trail maps, enhancing trailhead facilities, and installing signs marking the trail.  It is undisputed that the Forest Service analyzed those segments of the Shoshone Trail which are within the Ogden Ranger District.  OTP11211.  In taking site-specific actions, however, Plaintiffs contend that the Forest Service should have conducted a NEPA analysis for the Shoshone Trail system.  The Forest Service disputes that it has promoted the Shoshone Trail in any way.

Regardless of whether "site-specific action" has been taken, the ROD/FSEIS does sufficiently analyze the impact of the designation of the Shoshone Trail.  The Forest Service initially suggested, in the 2004 DEIS, that the identification of the Shoshone Trail "has had the effect of attracting motorized recreation visitors to this area."  OTP06157.  In the 2007 ROD/FSEIS, however, the Forest Service concluded that "[t]he naming of the Shoshone [Trail] is not expected to change the use patterns or create new users."  OTP11262.  Plaintiffs point out this inconsistency and argue that the Forest Service erroneously concluded it was "impossible" to determine whether the designation led to an increased use of trails within the Shoshone system.  Plaintiffs' Opening Brief at 39.

In 2004, the Forest Service began monitoring Shoshone Trail use with traffic counters and visitor counts.  OTP06157.  Although this data shows heavy use on the Curtis Creek Trail, part of the Shoshone Trail system, the Forest Service maintains that it cannot accurately ascribe

16

this use to the Shoshone designation.  Forest Service Brief at 35.  Indeed, after a review of

scientific literature on the effects of wilderness designation, the Forest Service concluded that it

was "impossible" to distinguish whether increased ridership of motorized trails in the area arose

because of the designation of the Shoshone Trail, the growing local population or increasing

popularity of motorized recreation.  OTP11262.

      Under the Council on Environmental Quality ("CEQ") regulations, if information cannot

be obtained, the agency must: 1) state "such information is incomplete or unavailable"; 2) state

the relevance of the information; 3) summarize "existing credible scientific evidence" relevant to

evaluation of adverse impacts; and 4) evaluate adverse impacts in a manner consistent with

generally accepted theoretical approaches or research methods.  40 C.F.R. § 1502.22.  The Forest

Service satisfied this requirement.  First, it admitted it cannot conclusively attribute increased

patterns of ORV use to either designation of the Shoshone Trail or population growth.

OTP11262.  Second, it acknowledged that increased trail usage may displace other uses and

impact the environment.  *Id.*  Third, the Forest Service surveyed and summarized traffic counts,

visitor counts, scientific literature, and a review of Forest Service advertising.  OTP11411;

OTP06157.  Fourth, the agency evaluated the sections of the Shoshone Trail designated as open

using its standard analysis of environmental images.  *See* OTP11211.  This process was

sufficient for the Forest Service to decide that a conclusive determination of designation effects

was impossible.

      Furthermore, the Forest Service's analysis of available information was sufficient to

satisfy NEPA.  The Tenth Circuit has held that even anecdotal information, such as staff

observations and trail interviews, can be sufficient for an EIS evaluation of recreation use rates.

17

*Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1180 (10th Cir. 2008).  In this case, the Forest Service went much further, collecting and analyzing traffic counts and surveying related scientific studies.  This process was sufficient public disclosure and adequate for informed decision making.  It is acceptable that as the Forest Service collected and analyzed information it changed its opinion on the relationship between the Shoshone Trail designation and an increase in motorized trail use.  The court is not to question the Forest Service's decision, but only determine whether the Forest Service took a hard look at the relevant data before making its decision.  In this case, the Forest Service satisfied NEPA's hard look standard because it collected quantitative data, reviewed available qualitative data, and incorporated this information into its NEPA analysis.

**C.    Cumulative Effects Outside the Ogden Ranger District**

As discussed above, Plaintiffs argue that the Forest Service inadequately analyzed the effect the designation of the Shoshone Trail might have on the trails within the Ogden Ranger District.  Plaintiffs also argue that the Forest Service should have considered the effect the new Travel Plan might have on the Shoshone Trail.  Plaintiffs' Opening Brief at 40.  This is a cumulative effects issue because by opening additional trails which access or are part of the Shoshone Trail the Forest Service's actions may have encouraged further use of the Shoshone Trail, both within and outside the boundaries of the Ogden Ranger District.  In the final ROD/FSEIS, the Forest Service acknowledged that  "adding more motorized routes in the same area where there are designated Shoshone Trail segments could cumulatively result in increasing motorized use in an area already very popular with motorized users."  OTP11262.

18

At least two other court decisions have held that if a trail increases use of, or access to, a regional off-road vehicle trail system, an agency is required to analyze the cumulative impacts of increased trail use on the entire regional trail system.  *N. Cascade Conservation Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193, 1199 (W.D. Wash. 1999); *Wash. Trails Ass'n v. U.S. Forest Service*, 935 F. Supp. 1117, 1123 (W.D. Wash. 1996).  This is because the "proper reference point for a cumulative impacts inquiry is the entire [off-road vehicle] trail system."  *N. Cascade Conservation Council*, 98 F. Supp. 2d at 1198.  Indeed, the "environmental significance of [a trail] cannot be accurately assessed unless the potential for increased use resulting from the cumulative impact of the projected network of [off-road vehicle] trails . . . is carefully considered."  *Wash. Trails Ass'n*, 935 F. Supp. at 1123.[3]

The Forest Service did not analyze the cumulative effects its decision might have on the Shoshone Trail system, as required under NEPA.  Although the Forest Service cannot ignore the cumulative effects, it does have discretion to determine a reasonable geographic scope for its cumulative impacts analysis.  *Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1090, 1097 (E.D. Wis. 2005) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).

---

[3] Defendants attempt to distinguish these cases from the present facts by stressing that neither *North Cascades* nor *Washington Trails* involved an evaluation of an EIS.  *North Cascades* involved a challenge to an Environmental Assessment ("EA"), which is an environmental analysis required by NEPA in some situations, to determine whether a federal action will affect the environment to the extent that an EIS must be prepared.  *Washington Trails* was a challenge brought against a federal agency when it undertook a project without ever preparing an EA or an EIS.  Despite these differences, however, the cases are on point.

*North Cascades*, *Washington Trails* and the controversy currently before the court all involve a challenge by a group to a federal agency's failure to adequately analyze the cumulative impacts of a decision as required by 40 C.F.R. § 1508.  Both *North Cascades* and *Washington Trails* applied the arbitrary and capricious standard which governs judicial review of an administrative decision. Therefore, these cases are applicable despite the different types of agency actions involved.

In sum, the Forest Service must consider the cumulative effects of the Travel Plan upon the Shoshone Trail system, or adequately explain why such an analysis is not possible. This explanation must be explicit and not be left for inference from other conclusions. In this analysis, the Forest Service may consider the relative size of the Travel Plan system compared to the size of the Shoshone Trail system in deciding whether there would be any meaningful impact. The Forest Service, however, need not consider the cumulative effects a future expansion of the Shoshone Trail might have upon the Ogden Travel Plan, because the projects are not fully interdependent. Furthermore, its consideration of the effects of the Shoshone Trail system designation were adequate and satisfy NEPA's hard look requirement.

## III.   DISPERSED CAMPING

Plaintiffs contend that the ROD/FEIS and ROD/FSEIS inadequately discuss dispersed camping.[4] According to the ROD/FEIS, dispersed camping increases motorized transportation "in the form of access to and from these camps on system roads, [motorized] use of the roads and trails near these camps, and creation of unauthorized user created routes." OTP07110. In addition to these cumulative effects, Plaintiffs also add that dispersed camping has direct, adverse environmental effects which must be considered. Plaintiffs' Opening Brief at 44. Given this acknowledgment that dispersed camping has adverse cumulative and direct effects, Plaintiffs argue that the ROD/FEIS and ROD/FSEIS must consider the extent to which the Forest Service's decision to open additional routes may encourage increased dispersed camping.

---

[4] Dispersed camping is camping that occurs outside of developed campsites, often along forest roads.

20

In evaluating the prevalence of dispersed camping, the ROD/FEIS finds that dispersed camping is not "likely to occur to any great extent" and, therefore, "there is no practical . . . way to estimate or quantify where and how much dispersed camping use will be occurring." OTP07105.  Nevertheless, the Forest Service did catalogue all dispersed camping sites which it could locate along motorized trails within the Ogden Ranger District.  Plaintiffs do not dispute the extent to which dispersed camping occurs or is likely to occur in the future.

Only "reasonably foreseeable" future cumulative impacts need be considered by an agency in making a decision under NEPA.  40 C.F.R. § 1508.7.  In the Tenth Circuit, even reasonably foreseeable impacts only require a discussion in the EIS which "furnish[es] such information as appears to be reasonably necessary under the circumstances for evaluation of the project."  *Utahns for Better Transp.*, 305 F.3d at 1176.

The possibility of increased dispersed camping may be reasonably foreseeable, but the Forest Service carefully evaluated the problem and concluded  such activity is "not likely to occur to any great extent."  OTP07105.  Therefore, the court finds that more information is not "reasonably necessary" to evaluate the project under the standard established by the Tenth Circuit, and this issue has been sufficiently evaluated in the ROD/FEIS and ROD/FSEIS to satisfy the requirements of NEPA.

**IV.    SUFFICIENT ARRAY OF ALTERNATIVES**

Plaintiffs allege that the Forest Service violated NEPA by failing to consider Plaintiffs' Conservation Alternative ("the Conservation Alternative").  Plaintiffs' Opening Brief at 49–50.  The Forest Service responds that, although it did not consider every detail of the Conservation Alternative, Defendants' Alternative One was sufficiently similar so as to obviate the need for an

in-depth consideration.  Forest Service Brief at 36.  Plaintiffs allege that the Forest Service also violated NEPA by failing to consider alternatives which would close the Dock Flat and Dry Bread concentrated use areas and/or prohibit dispersed camping.[5]  Plaintiffs' Opening Brief at 49.  For the reasons given below, the court concludes that Alternative One adequately addressed the Conservation Alternative and that consideration of Plaintiffs' other proposed alternatives was precluded by the Forest Plan.

A.      **The Reasonable Alternative Requirement**

NEPA requires that every EIS include "a detailed statement by the responsible official on . . . alternatives to the proposed action."  42 U.S.C. § 4332 (c)(iii).  Courts use a "rule of reason" test to determine how much information agencies need about alternative methods of accomplishing their stated goals.  *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999).  This test measures whether an agency, when choosing among alternatives, has "information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned."  *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992) (internal quotations omitted).  In making this determination "courts look closely at the objectives identified in an EIS's purpose and needs statement."  *Citizen's Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir. 2002).

Agencies must "defin[e] the objectives of an action and then provide legitimate consideration to alternatives that fall between the obvious extremes."  *Colo. Envtl. Coal.*, 185 F.3d at 1175.  This requirement is, however, balanced against practical considerations which

---

[5] Plaintiffs also protest Defendants' failure to analyze an alternative which would close the Dry Bread sinkhole play area.  This proposal, however, was a part of Plaintiffs' Conservation Alternative and, therefore, will not be considered separately.

dictate that an EIS "cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.  Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative."  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 551 (1978).

**B.      Alternative One and the Conservation Alternative**

Both Alternative One and the Conservation Alternative seek to conserve and protect the natural environment, primarily through the restriction of motorized activity.  This means there is substantial overlap between the goals of Alternative One and those of the Conservation Alternative.  There is also significant agreement between both plans' details.  Both plans call for the closure of the Tilda Springs, Box Elder, Pete's Hollow and Sink Hole Loop Routes to motorized use.  *Compare* OTP06990–06992 *with* OTP06620–06621 *and* OTP11014–11015. Both plans also call for keeping the Dry Break Upper Route closed, and for managing the Mantua Church Camp road as solely an administrative route.  *Id.*

Although the alternatives are similar, they are not identical, and the Conservation Alternative included a handful of suggestions which went unconsidered by the Forest Service. Given the general harmony between the two alternatives, the question is not whether a conservation-oriented alternative was reasonable, but whether those aspects of the Conservation Alternative unexamined by the Forest Service were also part of a reasonable alternative that required analysis.

The Forest Service was aware of the conservation-minded alternatives to its proposed action, and in Alternative One it considered the over-arching goal of conservation, with an

23

emphasis on reducing motorized recreation.  Its analysis of Alternative One provided it with comprehensive information about the pros and cons of a conservation alternative focused on road closure.  The fact that the Forest Service did not consider the closure of every specific route that Plaintiffs suggested does not alter this.  An agency is not required to evaluate every conceivable alternative.  *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 551.  The Forest Service considered an adequate range of alternatives to allow it to make an informed decision among the existing possibilities.

**C.**      **Plaintiffs' Other Alternatives and the Forest Plan**

Plaintiffs allege that the Forest Service also violated NEPA by failing to consider alternatives which would close the Dock Flat and Dry Bread concentrated use areas and/or prohibit dispersed camping.  The Forest Service, however, has an obligation to manage the forest in accordance with the prescriptions set forth in the Forest Plan, which was itself subject to NEPA review.  *Colo. Envtl. Coal.*, 185 F.3d at 1175.  Because the Forest Plan prohibited the Forest Service from considering such alternatives, Defendants were not required to evaluate them in the EIS.  *See id.*; *Citizen's Comm. to Save Our Canyons*, 297 F.3d at 1031.

The Forest Plan provides for "[d]ispersed recreation activities and areas [that] will meet a wide variety of user preferences," including dispersed camping, except in areas "where that use cannot be made compatible with standards for resource protection."  OTP00179–00180. Furthermore, the Forest Plan specifically addresses the issue of concentrated use areas such as Dry Bread and Dock Flat, noting that "[y]ears of increasing use have left sites with undesirable research conditions.  However the recreation use of these areas is well established and many are even traditional undeveloped family camping and family reunion sites, *and a desired*

24

*opportunity*."  OTP00088 (emphasis added).  In addition, Dry Bread and Flat Dock are specifically referenced in the Forest Plan as areas which will remain open to dispersed camping. OTP00202 ("Opportunities for dispersed camping will be provided in the Dock Flat area."); OTP00203 ("In the Dry Bread area of Monte Cristo, designated dispersed overnight settings will be provided . . . .").  As the Forest Service need not evaluate alternatives which are precluded by the Forest Plan, it was not required by NEPA to consider closing Dry Bread and Dock Flat or prohibiting dispersed camping.

## CONCLUSION

For the reasons explained above, the Forest Service is not required to further consider the environmental impact of the designation of the Shoshone Trail, the potential for future expansion of the Shoshone Trail, or the potential cumulative impacts of dispersed camping.  Additionally, the Forest Service evaluated an adequate array of alternatives, and should not be compelled to consider Plaintiffs' proposed possibilities, some of which would contradict the Forest Plan.

The court concludes, however, that the ROD/FEIS and ROD/FSEIS failed to adequately consider and disclose whether illegal trail use and creation might vary by alternative.  Although the Forest Service catalogued existing illegal trails, it should have provided notice to the public that it would answer reasonable inquiries about how to use the data or provide assistance in understanding the information provided.  Furthermore, the Forest Service must provide support for its conclusion that the Travel Plan's impact on illegal use will be neutral.  Absent such support, the Forest Service will be required to evaluate whether the Travel Plan will increase illegal use.

Additionally, the Forest Service must evaluate whether its decision will have any impact upon the Shoshone Trail system.  Although the Forest Service may find that opening additional trails within the Ogden District will not affect the larger trail system, NEPA requires that this determination be explicit.

Therefore, this case is REMANDED to the Forest Service for proceedings consistent with this opinion.  The status quo as of this date shall be maintained until such time as the EIS is amended to address the deficiencies set forth herein.

DATED this 7th day of March, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge